IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 21, 2012 Session

**STATE OF TENNESSEE v. SAMUEL MOORE**

**Direct Appeal from the Circuit Court for Warren County**
**No. F-11829      Larry B. Stanley, Jr., Judge**

---

**No. M2011-01680-CCA-R3-CD - Filed January 31, 2013**

---

A Warren County Circuit Court Jury convicted the appellant, Samuel Moore, of attempted first degree murder, aggravated assault, and assault. The trial court imposed a total effective sentence of thirty-one years in the Tennessee Department of Correction. On appeal, the appellant challenges the State's failure to provide him with a verbatim transcript of the suppression hearing, the trial court's denial of his motion to suppress, the sufficiency of the evidence supporting his convictions, and the sentences imposed. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for appellant, Samuel Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Joshua Crain, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The appellant's charges stemmed from two shootings on the night of September 3, 2008, at the home of the victims, Timothy Dorris and his mother, Carol Wright. At trial, Dorris testified that he was in a sexual relationship with Brandy Franklin while Franklin was

living with and romantically involved with James Bailey. Dorris believed that Franklin was in love with him and wanted her to end her relationship with Bailey.

Dorris stated that in the beginning of September 2008, he was living with his mother. On the night of September 3, 2008, Dorris was drunk and called Franklin, who was at Bailey's house. He said that the conversation was "civil" until "somebody else grabbed the phone and started cussing me out." He did not know the identity of the person.

Shortly after the call, someone drove by Dorris's house and fired three or four shots at the house. When they heard the shots fired, Dorris and Wright ran outside the house and saw a white vehicle drive away. Although Dorris ran toward the vehicle as it left, he was unable to see who was in the vehicle. Dorris and Wright went back inside the house, and Dorris called Bailey's house. He said that he was angry because he thought "they" had shot at him. Dorris could not recall if he spoke with someone or if he left a message.

Dorris testified that after the shooting outside, he continued drinking. He and Wright were in the living room when someone kicked in the front door. Dorris got out of the recliner, looked out the door, and saw the appellant pointing a twelve gauge shotgun at him. The appellant asked "if [he] was Tim." Dorris said no and closed the door. As he turned around, a bullet came through the door and struck the left side of his back. At the time of the shooting, Dorris had never met the appellant.

Dorris said that he was hospitalized for approximately two weeks but could only remember the final three or four days of his stay. Dorris lost three ribs and his spleen, his colon was "severed," and he underwent three or four surgeries. After he was released from the hospital, he went to live with his sister because he was afraid to go home. He continued to see a doctor because of pain in his stomach. Additionally, he said that he was seeing a counselor for post-traumatic stress disorder (PTSD).

On cross-examination, Dorris acknowledged that he had never spoken to the appellant before the day of the shooting and that he could not identify the person with whom he spoke over the telephone. He said that the door opened toward his recliner and that the recliner prevented the door from completely opening. He acknowledged that the door was closed when the gun was fired and that the shooter could not see where Dorris was standing.

Robert Boisinraut, one of the paramedics who responded to the scene, testified that when he arrived, Dorris was lying inside the door, leaned up against a chair. Dorris "had an abdominal evisceration, which means that basically his intestines were protruding from his body." Boisinraut said that Dorris was alert and spoke with him but that Dorris's injuries were life-threatening, and he had to be taken to Erlanger Hospital by medical helicopter.

Wright testified that on the night of the shootings, she left to run an errand, and, when she returned, Dorris was drunk, upset, and crying. He said that he and Franklin had an argument over the telephone. Wright said that they heard a gunshot and went outside. After they were outside, Wright heard three gunshots being fired from the road. She saw a white sport utility vehicle (SUV) with one of its doors open. She also saw a gun but was unable to see the shooter. The SUV drove away, and Wright thought it might be Franklin. Dorris ran through a field toward the vehicle but could not catch it. After the vehicle left, Dorris and Wright went back in the house.

Wright said that after the shooting outside, she and Dorris were sitting in the living room. The next thing she recalled was seeing "the front door come flying in," and a male voice asked, "Are you Tim?" Dorris said no and tried to shut the door. Wright heard a loud pop and saw the front door's insulation material spray into the air. Dorris leaned over a desk, looked "dumbfounded," and told her that he had been shot. Wright helped Dorris to the floor, then she called 911. Wright did not see who was behind the door.

Wright said that she and Franklin were friends and that she knew Franklin was involved in a relationship with both Bailey and Dorris. Wright recalled that about three months prior to the shooting, she went to Bailey's house to see Franklin. The appellant and Bailey were at Bailey's house. Dorris was drunk and had telephoned for Franklin. The call agitated the appellant, and he looked at Wright and repeatedly told her, "[Y]our son ain't nothing but a n[*****]." He also stated, "I got something for him," then looked at Bailey.

Brandy Franklin testified that she was living with Bailey when she began a romantic relationship with Dorris. She told Dorris that she wanted to be with him exclusively if she could get out of her relationship with Bailey.

Franklin said that on the night of the shooting, she was at Bailey's house and was talking to Dorris on a cellular telephone. Franklin said that Bailey knew she was speaking with Dorris but that he did not care that she was involved with Dorris. The conversation ended, but Dorris called again. Franklin handed the telephone to her best friend, then Franklin passed the telephone to the appellant. The appellant laughed and told Dorris, "I'll whoop your ass, boy. . . . I'll show you how to do it." The appellant closed the telephone, said he was going home, and left Bailey's house.

Franklin said that at some point that night, Dorris left a message on the answering machine, saying, "[Y]ou just going to leave me like this, drive by and shoot." Franklin did not know what Dorris was talking about until police told her about the shooting.

Franklin said that on the night of the shooting Bailey left for work around 9:30 p.m. At approximately 10:00 p.m., Franklin left to go to a friend's house in Jacksboro. Ashley Nunley and Cody Pryor, who were living with Franklin but were not related to her, called Franklin and told her that they thought police were at the house. Franklin told them to get down, be quiet, and go across the field to Bailey's mother's house.

Franklin said that later that night, Investigator Martin found her at a friend's house and told her that Dorris had been shot. Investigator Martin took her to the Warren County Jail where she gave a statement, but she did not mention the conversation between the appellant and Dorris because she did not think the appellant's threat was serious. In her statement, she said that Bailey told her to "keep her mouth shut." A day or two later, Investigator Martin spoke with Franklin again and informed her that he knew she had left the appellant's involvement out of her first statement. At Investigator Martin's behest, Franklin gave another statement, acknowledging that she knew the appellant because he had done some painting and mowing for Bailey. She also acknowledged that the appellant was at Bailey's house on the day of the shooting, that he spoke with Dorris on the telephone, and that he threatened to "whoop" Dorris.

On cross-examination, Franklin stated that the appellant never threatened to shoot Dorris and reiterated that she did not take the appellant's threat to "whoop" Dorris seriously.

James Bailey testified that he was engaged to Franklin. Bailey said that on the night of September 3, 2008, the appellant came to his house and that he gave the appellant twenty dollars to buy gas. Bailey denied that he paid the appellant to shoot Dorris.

Ashley Nunley testified that she had lived with Franklin's best friend, who was "kind of like [Nunley's] mom," and that the woman and Nunley were living with Franklin. On the night of September 3, 2008, the police came by Bailey's house. At Franklin's direction, Nunley and Cody Pryor, Nunley's ex-boyfriend, left Bailey's house and went to Bailey's mother's house to avoid the police. Later that night or early the next morning, police found Nunley and Pryor and took them to the Warren County Sheriff's Department to give statements. Nunley told police that she did not know anything. Subsequently, on September 11, 2008, Nunley gave a written statement to police. In her written statement, she said that the appellant came by Bailey's house the night of the shooting, that the appellant stayed a few minutes then left, and that about an hour later, the appellant came back then left again.

Cody Pryor testified that on September 3, 2008, he was outside Bailey's house working on his car. Pryor saw the appellant come to Bailey's house one time and leave. Later that evening, when police came by Bailey's house, Franklin telephoned Pryor and Nunley and told them to leave and go to Bailey's mother's house. They complied.

The next day, Pryor talked to the police. In his first statement, he did not tell police about seeing the appellant at Bailey's house. Just before Pryor's second statement, the police told Pryor that Dorris had been shot and that Dorris thought Pryor did it. Pryor said the accusation made him angry because he knew it was not true. Therefore, in his second statement, Pryor told police that the appellant was at Bailey's house on the night of the shooting. Pryor said he had heard that "there had been [a] confrontation between [Dorris] and [the appellant] over the phone and that it had led to [Dorris] being shot."

Investigator Marc Martin testified that at around 10:00 p.m. on September 3, 2008, he was called to the scene of the shooting. When he arrived, Dorris had already been taken from the scene. Wright and Dorris's sister were present; they told police that Dorris and Franklin were in a relationship and that they had a heated telephone conversation that night. They also said that the appellant was Bailey's friend and that the appellant had previously threatened to hurt Dorris. Wright said that the shooter looked like Michael Vargo; however, police verified that Vargo had an alibi for the time of the crime.

Investigator Martin said that he asked a patrol officer to go by Bailey's house but that no one answered the door. Later, Investigator Martin found Bailey at work. Bailey denied knowing about a relationship between Dorris and Franklin. Investigator Martin asked if Bailey had recently seen the appellant, and Bailey said that he had not seen the appellant for a month. Investigator Martin also spoke with Franklin, who revealed that she had spoken with Dorris that night. Franklin let Investigator Martin listen to a voicemail Dorris had left. Investigator Martin said that most of the witnesses were uncooperative.

Investigator Martin said that hospital staff notified him when Dorris was conscious and able to speak. Dorris was still "in bad shape," but Investigator Martin needed to talk with him because he did not know if Dorris would live or die. During the conversation, Dorris identified Pryor as the shooter.

Investigator Martin later spoke with Pryor, who denied involvement in the shooting. As a result of that interview, Investigator Martin spoke with Bailey. Bailey admitted that he knew of Franklin's relationship with Dorris and that the appellant had been at Bailey's house that night.

Subsequently, after waiving his Miranda rights, the appellant spoke with Investigator Martin. Investigator Martin recalled that the appellant "was willing to tell us fairly quickly that he had shot [Dorris]."

The appellant told Investigator Martin that around 8:00 p.m. on September 3, 2008, he went to Bailey's house. While he was there, he spoke with the appellant over the

telephone. He said that Dorris was drunk and threatened to rape the appellant's wife. Additionally, Dorris threatened to exhume the appellant's deceased parents and desecrate their bodies. The appellant got angry and told Bailey and Franklin that he was "going to take care of" Dorris. He drove to Dorris's house, fired some shots from the road to scare him, and returned to Bailey's house. When the appellant told Bailey what he had done, Bailey gave him twenty dollars. The appellant returned to Dorris's house and "shot him through the front door of his house." The appellant maintained that he did not intend to shoot Dorris and that he only wanted to scare him. The appellant said that after the shooting, he went home and went to bed. The next morning, he threw the gun "in a hole in Blues Hill."

Investigator Martin said that police were unable to recover the gun used to shoot Dorris. The appellant refused to tell police exactly where the gun was because he feared police would "charge [him] with that[,] too."

Investigator Martin testified that police collected a total of five shell casings from around Wright's house and the roadway. The slug that passed through Dorris was found in the front room. Investigator Martin noticed a hole in the front door consistent with a shotgun and saw that the door's foam insulation had been blown out around the living room. Investigator Martin said that the shotgun shells from Dorris's yard and the shotgun shells from the road near the house were all fired from the same gun.

Investigator Martin recalled that when the appellant left the general sessions courtroom after his case was bound over to the grand jury, Investigator Martin was sitting outside the courtroom with another investigator, "cutting up." The appellant "made the comment that he would get [Investigator Martin] for laughing at him."

The appellant did not present any proof at trial.

The jury convicted the appellant of the attempted first degree murder of Dorris, a Class A felony; the aggravated assault of Dorris, a Class C felony; and the assault of Wright, a Class A misdemeanor. The trial court sentenced the appellant to twenty-five years, six years, and eleven months and twenty-nine days, respectively. The court ordered the sentence for the misdemeanor assault conviction to run concurrently with the felony sentences. However, the court determined that the appellant's aggravated assault sentence should be served consecutively to his attempted first degree murder sentence, for a total effective sentence of thirty-one years. On appeal, the appellant challenges the State's failure to provide him with a verbatim transcript of the suppression hearing, the trial court's denial of his motion to suppress, the sufficiency of the evidence supporting his convictions, the trial court's refusal to merge the attempted first degree murder and aggravated assault convictions, and the trial court's imposition of consecutive sentencing.

## II. Analysis

### A. Statement of Evidence

First, we will address the appellant's claim that he is entitled to a new trial because a complete transcript of his suppression hearing was not available. On February 26, 2009, the appellant filed a motion to suppress the statement he made to police in response to custodial interrogation. A suppression hearing was held on May 13, 2009. A letter written by the court reporter reflects that during the suppression hearing, the recording equipment malfunctioned, and she was unable to produce a verbatim transcript of the proceedings. In an attempt to follow Rule 24 of the Tennessee Rules of Appellate Procedure, the State prepared a statement of the evidence reflecting what transpired during the suppression hearing.

The appellant filed an objection to the statement of the evidence, arguing that

> [a]ccording to the rule set forth in the case of State v. Draper, 800 S.W.2d 489 (Tenn. Crim. App. 1990), when the issues make out a colorable need for a complete record, the State is then required to provide the defendant with a complete verbatim transcript of the evidence and the proceedings. If the State contends as it does in this case that a statement of the evidence will suffice, the State then has the burden or onus of showing that a statement of the evidence is sufficient for the defendant to effectively present the issues and have them determined by the appellate court on the merits.

The appellant maintained that a summary of the testimony did not adequately "convey the full nature and character of the witness testimony." He asserted that the malfunction of the recording equipment was the State's fault and that "[t]he State's attempt to correct this problem is inadequate." The appellant contended that the statement of evidence prepared by the State "is insufficient for the [appellant] to effectively present the issues and have them determined by the appellate court on the merits"; therefore, he is entitled to a new trial.

The trial court filed an order denying the appellant's motion. The court held that the statement of evidence was a fair, accurate, and complete account of what transpired at the suppression hearing.

On appeal, the appellant challenges the trial court's ruling, again relying on Draper as authority for his claim that he is entitled to a new trial. The State contends that the appellant's reliance on Draper is misplaced. We agree with the State.

In Draper, this court recognized that an appealing party is required to provide the appellate court with a record sufficient to address the issues raised on appeal. See Draper, 800 S.W.2d at 492; see also Tenn. R. App. P. 24(b). This court also recognized that "the vast majority" of appealing defendants are indigent and cannot afford to have the necessary proceedings transcribed. See Draper, 800 S.W.2d at 494. Therefore, the Draper court held that an indigent defendant had the right to have the germane portions of the proceedings against him or her transcribed at the State's expense. Draper, 800 S.W.2d at 492-95. In other words, Draper primarily concerned the rights of an indigent defendant to have transcripts prepared even if he or she cannot afford it.

In Draper, however, this court did not hold that *only* a verbatim transcript satisfies the State's obligation "to provide the [indigent] defendant with a 'record of sufficient completeness' to permit proper consideration of the issues the defendant will present for review." Id. at 494 (quoting Draper v. Washington, 372 U.S. 487, 499 (1963)). Instead, this court acknowledged that an "accused may prepare and include a statement of the evidence and proceedings in the record if '*no* stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available'. [emphasis added]." Id. at 492 (quoting Tenn. R. App. P. 24(b)). We conclude that the appellant's reliance on Draper is misplaced.

In our view, the situation in the instant case is almost identical to State v. William Keith Blackburn, No. M2009-01140-CCA-R3-CD, 2011 WL 2893083 (Tenn. Crim. App. at Nashville, July 20, 2011), perm. to appeal denied, (Tenn. 2011). In Blackburn, the entire testimony of two trial witnesses and the partial testimony of one trial witness were unable to be transcribed due to technical problems and the court reporter's inadvertent failure to record those testimonies. Id. at *15. Blackburn's defense counsel prepared a statement of evidence but argued that "the 'statement is by no means a fair, accurate and complete account of the testimony of the missing witnesses.'" Id. at *16. However, on appeal this court concluded that the statement of the evidence satisfied Rule 24 of the Rules of Appellate Procedure and that the appellant's due process rights were not infringed.

As Rule 24 provides, when

> no . . . transcript of the evidence or proceedings is available, the appellant *shall* prepare a statement of the evidence or proceedings from the best available means, including the

-8-

appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. . . .

Tenn. R. App. P. 24(c) (emphasis added). In examining Rule 24, our supreme court has explained that

the rules allow for a statement of the evidence or proceedings to be used in cases where a verbatim transcript does not exist. Because the statements are partly generated from the parties' own recollections, however, Rule 24(c) anticipates that the appellant will file a statement, that the appellee may file objections to the statement, and that "[a]ny differences regarding the statement *shall* be settled as set forth in subdivision (e) of this rule" (emphasis added). Moreover, Rule 24(e) expressly requires that the differences "*shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court*" (emphasis added). When "shall" is used in a statute or rule, the requirement is mandatory.

Bellamy v. Cracker Barrel Old Country Store, Inc., 302 S.W.3d 278, 281 (Tenn. 2009). Rule 24 further provides that "[a]bsent extraordinary circumstances, the determination of the trial court is conclusive." Tenn. R. App. P. 24(e).

In the instant case, the State prepared a statement of evidence, which the trial court found was a "fair, accurate and complete account" of the suppression hearing. The appellant did not contend that the statement of evidence was inaccurate; instead, he argued that "[t]he testimony cannot simply be summarized adequately to convey the full nature and character of the witness testimony" because the "nuances in the testimony cannot be replicated by a statement of this kind." Therefore, he contended that without a verbatim transcript of the suppression hearing, this court would be unable to consider whether the appellant's statement was admissible. We conclude that, as the trial court found, the statement of the evidence is sufficient for our review of the issues.

## B. Motion to Suppress

Next, we will address the appellant's complaint regarding the denial of his motion to suppress. In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of

fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The appellant contends that his confession should have been suppressed because he was illiterate and did not knowingly and intelligently waive his rights against self-incrimination. Generally, for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Further, to determine the admissibility of a confession, "the particular circumstances of each case must be examined as a whole." Id. If, prior to making a statement, the police inform the accused of his Miranda rights and the accused proceeds to knowingly and voluntarily waive those rights, the statement is then admissible against the accused due to the valid waiver of the privilege against self-incrimination. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998) (citing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)).

This court has previously stated that

> despite testimony of the appellant's illiteracy, mental disability, and educational background; these factors do not, in and of themselves, render the appellant's statement involuntary. See State v. Perry, 13 S.W.3d 724, 738 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1999) (citing State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985); State v. Greer, 749 S.W.2d 484, 485 (Tenn.. Crim. App. 1988); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984). Rather, they constitute factors for the trial court to consider in evaluating the totality of the circumstances.

State v. John Philip Noland, No. E2000-00323-CCA-R3-CD, 2000 WL 1100327, at *6 (Tenn. Crim. App. at Knoxville, Aug. 3, 2000).

In the instant case, the trial court found that the appellant was informed of his <u>Miranda</u> rights and that he did not indicate that he did not understand his waiver. Investigator Martin testified that he read the appellant his rights directly from a form on which the rights were written. The appellant acknowledged that he understood the waiver and signed the form. The appellant did not indicate that he did not understand or that he was illiterate. Although the appellant's wife testified that the appellant was illiterate, Investigator Martin asserted that he read each portion of the statement to the appellant as he wrote it and then read the entire statement to the appellant before the appellant signed the statement. There was no proof that the appellant did not understand his rights or his statement. Accordingly, we conclude that the trial court did not err in denying the appellant's motion to suppress.

## C. Sufficiency of the Evidence

The next issue listed in the appellant's "Statement of Issues Presented for Review" is whether the evidence was sufficient to sustain the appellant's convictions. However, the appellant did not make any argument concerning this issue. Therefore, we conclude that the appellant has waived this issue. <u>See</u> Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## D. Sentencing

The appellant's remaining issues concern the trial court's sentencing determinations. The appellant contends that the trial court erred by imposing sentences for attempted first degree murder and aggravated assault instead of merging the convictions. He also contends that the trial court erred by imposing consecutive sentences.

On appeal, the appellant argues that "[i]t does not appear that the court should have sentenced the [appellant] to consecutive sentences for attempted first-degree murder and aggravated assault. These two offenses arose out of the same incident and were part of the same investigation, and an acquittal or conviction of one . . . would have barred prosecution for the other." Although the appellant has couched this issue as a challenge to consecutive sentencing, he appears to raise double jeopardy concerns. Generally, the double jeopardy clauses of the United States and Tennessee constitutions protect an accused from: (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. <u>State v. Watkins</u>, 362 S.W.3d 530, 548 (Tenn. 2012).

Initially, we note that the record does not include the opening and closing statements. However, in its response to the appellant's argument regarding consecutive sentencing, the State said that the appellant

went to an individual that he did not know on two separate occasions on the night in question, the first time firing off rounds which led to the initial charge of aggravated assault, . . . which the jury convicted him of and subsequently going back to that residence, though that time shooting the individual through the door after asking what his name was and verifying that he was the individual he wanted to shoot, leading to the . . . attempted first degree murder.

The appellant did not challenge the State's recitation of facts. Moreover, the appellant did not argue at the sentencing hearing or in his motion for new trial that the convictions were based upon the same incident. In fact, the appellant raises this issue for the first time on appeal. Based upon the evidence at trial, it is apparent that the convictions were based upon separate incidents. Accordingly, we conclude that the appellant's convictions do not violate double jeopardy and that his claim is without merit.

As his final issue, the appellant challenges the trial court's imposition of consecutive sentencing. Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Christine Caudle, __ S.W.3d __, No. M2010-01172-SC-R11-CD, 2012 WL 5907374, at *5 (Tenn. at Nashville, Nov. 27, 2012).

In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the sentencing hearing, the State submitted the appellant's presentence report as an exhibit. The appellant stipulated the accuracy of his criminal convictions contained in the report. Specifically, the report reflects that the appellant had three felony convictions for marijuana possession, three felony convictions for domestic violence, one felony conviction for child abuse, and misdemeanor convictions for marijuana possession, trespassing, driving on a suspended license, and possession of drug paraphernalia. The report also reflects that the appellant violated probation on three separate occasions.

In sentencing the appellant, the trial court noted that the appellant's prior criminal record was extensive and "very troublesome." The court said, "Anyone who would engage in those types of behaviors over a number of years and then engage in the type of behavior

that occurred here is a thoroughly dangerous and – dangerous is the best word to use for it. He is a danger to society." The court noted:

> The facts of this case are even more troublesome in that . . . this was not an ongoing feud. This is not retaliation from harming your child, harming your mother. Really this was – I believe most of the proof was that the [appellant] and the victims really didn't know each other that well. It's hard to imagine a much more bizarre and frightening scenario than what happened here. We want to be safe. We want to be free to come and go. We want to have confidence in our fellow citizens in the city and the state and the United States and behave like somewhat rational human beings and that is about as far from what [the appellant] did in this situation as you could get, a random – almost randomly shooting a man in his own house with a shotgun for very little reason and causing great damage to him, causing the . . . assault towards his mother, the other assault.

The trial court sentenced the appellant to twenty-five years for the attempted first degree murder conviction, six years for the aggravated assault conviction, and eleven months and twenty-nine days for the misdemeanor assault conviction. The court ordered the sentence for the assault conviction to run concurrently with the felony sentences. However, the court determined that the appellant's aggravated assault sentence should be served consecutively to his attempted first degree murder sentence.

The court found that the appellant was a dangerous offender whose behavior indicated little or no regard for human life. The court said, "[T]hat cannot be questioned I don't think." The court further found that the "circumstances surrounding the commission of this offense are aggravated. I think they're just simply atrocious and almost inhuman." The court stated:

> Confinement for an extended period of time is necessary to protect society from this gentleman's unwillingness to lead a productive life and there is no question in my mind that this gentleman would resort to additional criminal activity in furtherance of what I would call an anti-social lifestyle and that the aggregate length of the sentences reasonably relates to the offense[s of] which the [appellant] stands convicted.

-14-

Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria. In the instant case, the trial court found criterion (2), that the appellant was an offender whose record of criminal activity is extensive, and criterion (4), that the appellant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(2), (4). In order to impose consecutive sentencing upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App.1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

First, we note that the trial court found that the appellant had an extensive criminal history. Our review of the record reveals that the appellant has several prior convictions, the majority of which involve drugs and physical violence. Therefore, we agree with the trial court's application of criterion (2). Additionally, the court found that the appellant was a dangerous offender, that he would likely return to criminal activity, and that the length of the sentences was reasonable in relation to the offenses committed. The trial court thoroughly supported these findings on the record. Again, we agree with the trial court's findings and conclude that the court did not err by imposing consecutive sentences.

### III. Conclusion

In sum, we conclude that the trial court did not err in accepting a statement of the evidence instead of a transcript of the suppression hearing and that the trial court correctly denied the appellant's motion to suppress. We further conclude that the evidence was sufficient to sustain the appellant's convictions, that his convictions do not violate double jeopardy, and that the trial court did not err by imposing consecutive sentencing. Therefore, we affirm the judgments of the trial court.

_____

NORMA MCGEE OGLE, JUDGE